[862 NYS2d 20]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v NEVILLE WELLS, Appellant.

First Department, June 26, 2008

### APPEARANCES OF COUNSEL

*Richard M. Greenberg, Office of the Appellate Defender*, New York City (*Joseph M. Nursey* of counsel), for appellant.

*Robert M. Morgenthau, District Attorney*, New York City (*Patricia Curran* and *Alice Wiseman* of counsel), for respondent.

### OPINION OF THE COURT

Tom, J.P.

This appeal raises the issue of whether a death resulting from defendant's operation of a motor vehicle at a high rate of speed through the streets of lower Manhattan, while severely impaired by alcohol intoxication, supports his conviction of depraved indifference murder (Penal Law § 125.25 [2]). The law in effect at the time defendant was convicted is delineated by *People v Register* (60 NY2d 270 [1983], *cert denied* 466 US 953 [1984]), and we hold that the evidence is sufficient to sustain the judgment under the *Register* standard, the verdict is consistent with the weight of the evidence, and the trial court properly declined to entertain the defense of intoxication to negate the culpable mental state of depraved indifference or to accept expert

testimony concerning defendant's chronic alcoholism. Were we to analyze this case under the standard of *People v Feingold* (7 NY3d 288 [2006]), as urged by defendant, we would reach the same result.

On June 14, 2004 at 2:00 A.M., Robert Smith drove from his home in Nassau County to the Fulton Fish Market, where he ran a wholesale seafood business. He was accompanied by his daughter, Judith Gubernikoff, 37 years of age, who had begun working for the family business that month after moving from Chicago to New York with her husband, Dr. George Gubernikoff, and their three young children so that Dr. Gubernikoff could accept a position at a Long Island hospital. Robert Smith testified that it was his custom to take the Williamsburg Bridge into Manhattan and drive south along Allen Street, which is a six-lane, divided roadway with a median separating the northbound and southbound lanes. Smith stated that he customarily traveled at 25 miles an hour to coincide with the timing of the traffic signals; however, he had no recollection of the events of that fatal morning.

At about 2:45 A.M., Adam Falek was in his pickup truck waiting at a red light on Waverly Street. As he made a right turn onto Broadway after the light changed, a blue van traveling south on Broadway came "flying" through the red light and almost hit his vehicle, causing him to swerve to the right to avoid a collision. Falek followed the blue van, pulling up alongside it at the next light, and began to yell at the driver, who paid no attention. Falek observed that the van's driver was rolling his head and looked "disheveled," "incoherent," "out of it," and "totally wasted." Without even looking over, he "just punched the gas and took off," stopping only momentarily after hitting a parked car about two blocks later. Falek continued to follow the van because it was going in his direction. However, he broke off the chase after the van ran through two more red lights: "he was going a high rate of speed and I was afraid, so I said it's not worth it." Falek estimated that, at the point he decided to discontinue the pursuit, his own vehicle was traveling at "[f]ifty, sixty miles an hour," and the distance between the two vehicles was increasing.

At approximately 2:55 A.M., Martin Clemente was in his Dodge Caravan in the westbound lane of Grand Street, facing the intersection with Allen Street, waiting for the light to change. There were still people coming back from the Hispanic Day parade crossing Grand Street directly in front of his vehicle. Look-

ing straight ahead towards the traffic light with an unobstructed view of the intersection, he observed a Saturn proceeding south on Allen Street at about 30 miles an hour into the intersection. Suddenly, a blue minivan "came out of nowhere" from the easterly direction on Grand Street, going "very fast," and without braking or slowing down entered the intersection against a red light. The front end of the van struck the passenger side of the Saturn. The force of the impact caused the minivan to spin around and come to a stop facing west in the intersection. "The Saturn went up in the air," propelled end over end, "doing a three-sixty, hit the floor, did another three-sixty," and landed on the fence of the divider on the northbound side of Allen Street.

After calling 911 to report the accident, Clemente went over to the Saturn. Smith appeared to be in shock, and Judith Gubernikoff was unconscious. Her seat was "crushed together" with the driver's seat, and both seats were tilted backwards, "so she was trying to gasp for air with her head back." From a distance of about 25 feet, Clemente watched defendant get out of the driver's side of the minivan. He appeared "dizzy" and was "walking around in circles."

At the same time, Coss Marte, who was standing in the vicinity with some friends, heard a loud crash and ran to the intersection of Allen and Grand Streets, where he saw the blue van in the middle of the intersection and the Saturn on top of the fence located on the median island. Marte also called 911. As the sound of ambulance sirens became audible, defendant attempted to "run away," "zigzagging" along Grand Street towards Eldridge Street. Marte chased defendant and, a minute or two later, Marte and another man grabbed defendant and brought him back to the accident scene. Marte and the other man had to "grab" defendant's arms because he was attempting to get away. Although defendant was mumbling incomprehensibly, he did not appear to have sustained injury.

Officer Christopher Owen, who responded to the 911 call, testified that defendant appeared disheveled, his clothes were messy, his eyes were bloodshot and a strong odor of alcohol emanated from his person. The officer "had to prop him up with my right hand under his arm to walk him towards the ambulance, and he was stumbling, stumbling as we walked." The officer added, "He appeared very confused, disoriented, seemed like he didn't know what was going on," and was unresponsive to questioning. Apart from "some blood coming from his nose," defendant did not appear to be injured.

Ms. Gubernikoff was brought to Bellevue Hospital's emergency room, where she was treated by Dr. Richard Moreno. A thoracotomy was performed, which revealed that she had sustained a hemopericardium—the accumulation of blood between the heart and the pericardial sac surrounding it. Because the injury prevented her heart from contracting appropriately, the pericardium was opened and the blood drained. At that point, Dr. Moreno observed a hole in the right atrium of the heart, an injury that is consistent with blunt force trauma sustained in a motor vehicle collision. Dr. Moreno testified that the force generated in the thoracic cavity necessary to cause the heart to rupture was "high velocity." While performing surgery to repair the hole, the medical team was unable to maintain blood pressure, and Gubernikoff was pronounced dead on the operating table at 4:50 A.M.

Robert Smith was also taken to Bellevue Hospital. A CAT scan revealed that blood had accumulated in his chest and behind the abdominal organs, near his kidneys. His injuries included a lacerated intercostal artery, and the internal bleeding required surgical intervention, without which he would have bled to death. Smith, who awoke three weeks later, remained in the intensive care unit until June 30, 2004. He was discharged from the hospital on July 9 and treated at a rehabilitation center for another two weeks. He was unable to return to work for approximately six months and experienced memory deficits, difficulty walking and climbing, and reduced stamina for months after the crash.

After the victims were taken to the hospital, an accident investigation team arrived at the accident scene. Detective Patrick Rooney, an expert in the field of collision investigation and reconstruction, observed no pre-crash skid marks, from which he deduced that neither driver had applied the brakes before the vehicles collided. The absence of skid marks prevented him from calculating the speed of the van. In addition, the doors and roof of the Saturn had been cut off to extricate the passengers, precluding calculation of its speed from "crush evidence." However, judging from the damage sustained by both vehicles and their respective weights (2,500 pounds for the Saturn and 4,300 pounds for the Ford Windstar minivan), the distance the Saturn traveled following the collision, its abrupt change of direction from south to southeast upon impact and the fact that it became airborne, Rooney concluded that the van must have been going from 50 to 55 to as much as 60 miles an hour when

the vehicles collided. He further testified that both occupants of the Saturn were wearing seat belts, which had been cut to facilitate extrication. From the absence of any imprint on the van's safety harness, meaning that it did not lock on impact, the witness concluded that defendant was not wearing his seat belt at the time of the collision.

Two blood samples were obtained from defendant at about 5:00 A.M. on the morning of the accident. Since he had passed out, the samples were taken with his implied consent by an emergency room doctor. Analysis of the two samples revealed a blood alcohol concentration of .25% and .27%, respectively. It was stipulated that defendant had previously attended an intoxicated driver rehabilitation course.

Defendant presented testimony from Nicholas Bellizzi, a civil engineer and expert in the field of engineering and accident reconstruction. Bellizzi testified that, in the absence of skid marks, there are two methods of accident reconstruction used to determine speed: conservation of kinetic energy and conservation of linear momentum. The first method is based on a calculation of the amount of force required to create the damage caused to the vehicles in a collision. Due to the damage done to the Saturn in removing the passengers, he was unable to use the conservation of kinetic energy method to calculate the van's speed. Using the conservation of linear momentum method, he estimated that the van had been traveling between 36 and 37 miles an hour and the Saturn had been traveling about 13 miles an hour at the time of impact, with a five percent margin of error. Bellizzi made his calculations using the heaviest Saturn model, which weighed 900 pounds more than the Smith vehicle. He worked from police diagrams and photographs without conducting any examination of the vehicles. From offset crash barrier tests performed by the Insurance Institute for Highway Safety, he opined that defendant's van would have sustained more severe damage to the occupant compartment had it been traveling at 55 miles an hour and that defendant, unrestrained by a seat belt, would have been propelled through the windshield. However, he conceded that vehicle damage inflicted by an offset crash would be greater since a smaller area of the vehicle absorbs the impact. The impact during an offset crash test is deliberately confined to the driver's side and not distributed over the full frontal width as in the case of a "frontal barrier impact" (such as the collision herein), where the entire front of the car strikes the barrier. Nor, he conceded, are offset crash

tests designed to simulate the collision of vehicles in different weight classes. Bellizzi did not take into account that the Saturn had flipped over because the conservation of linear momentum method does not utilize such data. Finally, he did not estimate how far the Saturn might have traveled had it not come into contact with the median fence, although from the minimal damage to the fence he concluded that it would not have traveled much farther.

The trial court, in a nonjury trial, refused to permit a psychologist to testify that, based on his examination, defendant suffered from chronic alcoholism, rejecting defendant's argument that this condition bore on his capacity to formulate the mens rea necessary for depraved indifference murder. Rather, the court held that voluntary intoxication is not a material consideration with respect to a crime involving reckless behavior.

The court found defendant guilty of murder in the second degree for causing the death of Judith Gubernikoff as a result of his reckless and wanton conduct. The court further found defendant guilty of assault in the first degree for "causing serious physical injury to Mr. Robert Smith that was occasioned by the same recklessness and indifference to human life that resulted in Mrs. Gubernikoff's death." Defendant was also found guilty of all lesser noninclusory concurrent counts in the indictment— vehicular manslaughter in the second degree, vehicular assault in the second degree and assault in the second degree. On July 29, 2005, the court sentenced defendant to a cumulative concurrent term of imprisonment of 17 years to life.

On appeal, defendant contends that the evidence is insufficient to sustain conviction of murder in the second degree and assault in the first degree because it failed to establish that his conduct was so morally deficient and devoid of concern for life as to warrant exposing him to the same criminal liability that the law imposes for intentional conduct (citing *People v Payne*, 3 NY3d 266, 271 [2004]). Relying on *People v Feingold* (7 NY3d 288, 296 [2006], *supra*), he argues that the evidence fails to show, even circumstantially, that he was capable of formulating the mens rea that delineates depraved indifference murder because his extreme intoxication rendered him "incapable of possessing the culpable mental state necessary to prove depraved indifference" (quoting *People v Coon*, 34 AD3d 869, 870 [2006]). He maintains that the trial court erred in refusing to receive relevant testimony concerning his chronic alcoholism.

Finally, defendant asserts that even when examined under the pre-*Feingold* standard of *Register*, his conduct falls far short of the extreme recklessness of drivers found similarly culpable, who generally appeared to be well aware of the risks they posed to others (*e.g. People v Gomez*, 65 NY2d 9 [1985] [driving on sidewalk at high speed]; *People v Williams*, 184 AD2d 437 [1992], *lv denied* 80 NY2d 935 [1992] [high-speed chase through construction site]). Defendant's contentions are unavailing.

Depraved indifference murder is committed when, "[u]nder circumstances evincing a depraved indifference to human life," a person "recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person" (Penal Law § 125.25 [2]). Similarly, assault in the first degree under a depraved indifference theory is committed when, "[u]nder circumstances evincing a depraved indifference to human life," a person "recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes serious physical injury to another person" (Penal Law § 120.10 [3]). A person acts recklessly "when he is aware of and consciously disregards a substantial and unjustifiable risk" (Penal Law § 15.05 [3]). The law in effect at the time of defendant's trial did not evaluate depraved indifference under the subjective mens rea standard announced in *Feingold* (7 NY3d 288 [2006], *supra*), but instead referred to an objective standard reflected by the "factual setting in which the risk creating conduct must occur" (*see Register*, 60 NY2d at 276). Prior to *Feingold*, our jurisprudence had not progressed to the point where recklessness had been abandoned in favor of the mens rea of depraved indifference to human life, and then only by a closely divided Court of Appeals, whose dissenters saw no reason to overrule *Register* (*see* 7 NY3d at 300 [Ciparick, J., dissenting], 301 [Kaye, Ch. J., dissenting], 305 [Graffeo, J., dissenting]).

 Defendant never objected that the trial court was required to find that he acted with a mental state beyond recklessness or that depraved indifference referred to anything other than the circumstances under which the risk-creating conduct took place. Indeed, in his motion to dismiss at the conclusion of the People's case after the close of evidence, defendant explicitly cited *Register*, arguing merely that the People had failed to establish his commission of the crimes charged under *circumstances* evincing a depraved indifference to human life. This objection did not suffice to apprise the trial court of

the contention now advanced by defendant that depraved indifference must be evaluated *subjectively* from his mental state and not *objectively* from the surrounding circumstances (*see People v Hines*, 97 NY2d 56, 62 [2001]; *People v Gray*, 86 NY2d 10, 20-21 [1995]; *People v Lawrence*, 85 NY2d 1002, 1004 [1995]). Furthermore, the Court of Appeals' purpose in effecting this change in the law was "to dispel the confusion between intentional and depraved indifference murder, and thus cut off the continuing improper expansion of depraved indifference murder" (*Policano v Herbert*, 7 NY3d 588, 603 [2006] [change in the law not retroactively applicable to convictions that have become final upon exhaustion of appellate review]). The People's reliance "on *Register*'s objectively determined degree-of-risk formulation" (*id.* at 604) in this matter does not implicate such concerns since there is no suggestion that defendant harbored any intent to cause harm. Thus, the court's evaluation of the sufficiency of proof according to the *Register* standard, which represented the prevailing law at the time defendant was convicted (*see People v Woods*, 36 AD3d 525, 526 [2007], *lv denied* 8 NY3d 951 [2007]), went unchallenged, and its failure to apply a mens rea standard, as now urged, is unpreserved for review (*see id.*, citing *Gray*, 86 NY2d 10 [1995], *supra*; *see also People v Orcutt*, 49 AD3d 1082, 1085 [2008]; *People v Zephirin*, 47 AD3d 649 [2008]), and we decline to reach the issue in the interest of justice.

■ Under *Register*, depraved indifference murder requires that a defendant's act be imminently dangerous, present a very high risk of death to others and be committed under circumstances that evince a wanton indifference to human life or a depravity of mind (*see Register*, 60 NY2d at 274). The requirement of depraved indifference refers neither to the mens rea nor to the actus reus; rather, it refers to "the factual setting in which the risk creating conduct must occur" (*id.* at 276).

The evidence adduced in this case overwhelmingly supports defendant's conviction of depraved indifference murder and depraved indifference assault. Having chosen to drive while heavily intoxicated, defendant proceeded to drive in an extremely reckless manner, creating a grave risk of death to pedestrians and other drivers in a densely populated area of lower Manhattan.

The People's proof showed that defendant was driving at a speed of between 50 and 60 miles an hour and speeding through red lights before entering the subject intersection against a red

traffic signal and plowing into Smith's Saturn. Defendant was operating a motor vehicle while, by his own admission, "barely *conscious* due to his intoxication,"* and analysis showed his blood alcohol level was close to three times the legal limit. Falek observed defendant "flying" through several red lights and hitting a parked car, and Clemente observed defendant's van coming out of nowhere, traveling "very fast" as it entered the intersection. Detective Rooney, based on his training and experience, estimated that the van had been traveling at 50 to 55 miles an hour, and possibly as high as 60 miles an hour, an opinion supported both by the damage to the vehicles and by the testimony of eyewitnesses. The impact between defendant's minivan and Smith's Saturn was sufficiently severe to cause the Saturn to become airborne and flip end over end two times before landing on top of a fence located on the median island. Defendant made no attempt to brake before hitting the Saturn, as indicated by the absence of pre-crash skid marks.

Defendant drove not only at a high rate of speed but dangerously, as evinced by his striking a parked car and nearly striking Falek's pickup truck before colliding with the Saturn. Defendant narrowly avoided striking Falek's vehicle under much the same circumstances under which he struck the Smith vehicle moments later—speeding through a red light toward a vehicle that was passing through the intersection with the right-of-way. Just as defendant made no apparent effort to avoid the collision with Smith's Saturn, he made no effort to avoid Falek, who was forced to swerve to the right to get out of the way. The fact that defendant continued driving in the same manner after almost striking Falek—indeed, reacting to Falek's attempt to get his attention by "punch[ing]" the gas pedal and speeding off again—demonstrated a depraved disregard of the very high risk of death or serious physical injury that his conduct posed to others. Thus, the evidence supports defendant's conviction of depraved indifference murder and assault (*see People v Gomez*, 65 NY2d 9 [1985], *supra* [defendant's excessive rate of speed and failure to brake while proceeding along a busy city street and partly onto its sidewalk satisfied depraved indifference element of crime]; *People v Hoffman*, 283 AD2d 928 [2001], *lv denied* 96 NY2d 919 [2001] [drinking and driving, excessive rate of speed, disobeying traffic signals, and failing to brake before he broadsided vehicle, killing and injuring the passengers

---

* As acknowledged in support of his application to introduce evidence of his chronic alcoholism.

therein, legally sufficient evidence of depraved mind murder]; *People v Padula*, 197 AD2d 747 [1993], *lv denied* 82 NY2d 928 [1994] [excessive rate of speed, failure to brake or take other evasive action, and decision to get behind the wheel of vehicle after becoming intoxicated, legally sufficient evidence of depraved mind murder]).

Further, while extremely intoxicated, defendant was not so impaired that he was unaware of what he had done, as indicated by his attempt to flee from the scene of the crash and his struggle with those who thwarted his escape. Moreover, it was conceded that defendant had previously attended a rehabilitative course for intoxicated drivers, which certainly would have alerted him to the grave danger that drinking and driving poses to others.

The verdict comported with the weight of the evidence, and the trial court properly credited the speed estimates proffered by the People's witnesses. The import to be accorded to expert testimony is generally within the province of the trier of fact (*see People v Schwartz*, 21 AD3d 304, 309 [2005], *lv denied* 7 NY3d 763 [2006]), which may determine whether to accept or reject it (*see People v Drake*, 7 NY3d 28, 33 [2006]). The trial court properly assessed the probative value of the witnesses' conflicting testimony (*see People v Bleakley*, 69 NY2d 490, 495 [1987]) and was warranted in rejecting defendant's expert's calculations and crediting the testimony of the People's eyewitnesses and an experienced police accident investigator that the minivan's speed was from 50 to 55 to as much as 60 miles an hour at the time of impact. When he first spotted defendant's van, Falek described it as "flying" through the red light, and estimated its speed at 50 to 60 miles an hour as it sped away. Falek pursued defendant's van for some distance and was in an excellent position to assess its speed from that of his own vehicle. He testified that, at the time he gave up his pursuit, his own vehicle was traveling at a speed of 50 to 60 miles an hour, and the distance between the two vehicles was increasing. While the van's speed was contested by defendant's expert, Bellizzi, who estimated a modest 36 to 37 miles an hour, he did not personally inspect the vehicles. His calculation utilized an exaggerated weight of the Saturn and employed a mathematical model of "linear momentum" that did not account for the fact that the vehicle had flipped over. The result of Bellizzi's computation was only as good as the variables that went into it. His determination of the critical "point of impact" (from which

all the other measurements flowed) was itself flawed in that it relied upon the location of scuff marks, the exact coordinates of which were unavailable.

The argument advanced by defendant that the element of depraved indifference to human life "may be negatived by evidence of intoxication," was explicitly rejected in *Register*, which holds that depraved indifference "is not an element in the traditional sense but rather a definition of the factual setting in which the risk creating conduct must occur—objective circumstances which are not subject to being negatived by evidence of defendant's intoxication" (60 NY2d at 276). Furthermore, Penal Law § 15.05 (3) expressly precludes evidence of intoxication as a defense to a reckless crime, providing that "[a] person who creates such a risk but is unaware thereof solely by reason of voluntary intoxication also acts recklessly." Thus, defendant's intoxication at the time of the collision, no matter how debilitating, is immaterial, as is his history of chronic alcoholism, and the trial court properly declined to consider such evidence.

The act of driving a vehicle while in a highly intoxicated state, at high speed, on city streets, ignoring traffic signals and failing to stop after striking a parked vehicle, demonstrates reckless conduct that created a grave risk of death to others so as to constitute depraved indifference to human life.

Defendant did not preserve his objection to the trial court's evaluation of the evidence under the *Register* standard, and we decline to review it in the interest of justice. As an alternative holding, we further reject, on the merits, defendant's argument that he was incapable of forming the mens rea required for depraved indifference murder. Even subjecting his conviction to analysis under *Feingold*, as defendant now urges, we conclude that the evidence nevertheless supports a finding that his conduct evinced a depraved indifference to human life. Operation of a vehicle weighing in excess of two tons at a high rate of speed on city streets while highly intoxicated is the very epitome of depraved indifference to human life, culpably equivalent to "shooting into a crowd, placing a time bomb in a public place, or opening the door of the lions' cage in the zoo" (*Payne*, 3 NY3d at 272 [internal quotation marks omitted]). It demonstrates "an utter disregard for the value of human life—a willingness to act not because one intends harm, but because one simply doesn't care whether grievous harm results or not" (*Feingold*, 7 NY3d at 296 [internal quotation marks omitted]). *People v Coon* (34 AD3d 869, 870 [2006]), relied upon by the

concurrence, is distinguishable. There, the defendant, in a state of cocaine intoxication delirium, assaulted his sister with a knife. The Third Department held that defendant was too intoxicated to possess the culpable mental state necessary to sustain conviction for a depraved indifference offense.

Here, defendant's mental state at the time of the collision, as attested by numerous witnesses, is not dispositive; rather, culpability is appropriately assessed at the time defendant made the conscious decision to embark on a course of conduct that inevitably resulted in his operation of a motor vehicle while in a state of extreme intoxication. The mens rea of depraved indifference in this case is established by circumstantial evidence demonstrating that defendant made a conscious decision to drink and then, after consuming an excessive amount of alcohol to the point of becoming "totally wasted," to drive on city streets at a high rate of speed through red traffic lights, thereby creating a grave risk of death to pedestrians and occupants of other vehicles. The distinction between depraved indifference and intentional conduct does not detract from the wisdom of the observation aptly made by the Court of Appeals in *Register*:

> "In utilitarian terms, the risk of excessive drinking should be added to and not subtracted from the risks created by the conduct of the drunken defendant for there is no social or penological purpose to be served by a rule that permits one who voluntarily drinks to be exonerated from failing to foresee the results of his conduct if he is successful at getting drunk" (60 NY2d at 280-281).

Defendant's depraved indifference is further supported by his comprehension of the dangers of drinking and driving. Having stipulated to attending an intoxicated driver rehabilitation course, there is record support for the conclusion that defendant was well aware of the risk that drunk driving posed to others. Thus, we conclude that the sufficiency and weight of the evidence prove beyond a reasonable doubt, even under *Feingold*, that defendant engaged in reckless conduct that created a grave risk of death to others and that he disregarded such risk under circumstances evincing a depraved indifference to human life, thereby causing the death of Judith Gubernikoff and serious physical injury to Robert Smith.

Accordingly, the judgment of the Supreme Court, New York County (Richard D. Carruthers, J.), rendered June 29, 2005, convicting defendant, after a nonjury trial, of murder in the

second degree, assault in the first degree, vehicular manslaughter in the second degree, assault in the second degree, and vehicular assault in the second degree, and sentencing defendant to concurrent terms of 17 years on the murder conviction, 15 years on the first-degree assault conviction, 7 years on the second-degree assault conviction, $2^{1}/_{3}$ to 7 years on the vehicular manslaughter conviction, and $1^{1}/_{3}$ to 4 years on the second-degree vehicular assault conviction, should be affirmed.

McGuire, J. (concurring). I agree with the majority that defendant's challenge to the sufficiency of the evidence, to the extent it is based on the holding in *People v Feingold* (7 NY3d 288 [2006]) that depraved indifference to human life is a culpable mental state, is not preserved for review. At defendant's trial, the clear understanding of the court and the parties, consistent with the holding in *People v Register* (60 NY2d 270 [1983], *cert denied* 466 US 953 [1984]), was that the only mental state required for the depraved indifference murder and assault counts was recklessness. Defendant made no argument or protest to the contrary. For this reason, defendant is wrong in contending that his current claim that depraved indifference is a culpable mental state is preserved for review merely because the court, in the course of ruling on a different issue that was in dispute, correctly stated the contrary holding in *Register* (*see People v Colon*, 46 AD3d 260, 263 [2007] [ruling by trial court on issue of law did not preserve issue for review when court's ruling was not made in response to a protest by a party]). I also agree with the majority that we should not review this unpreserved claim in the interest of justice. To the extent defendant is claiming on this appeal that the evidence was legally insufficient even when evaluated under the *Register* standard, I agree with the majority that the evidence was legally sufficient.

Although there was no jury to be instructed, the clear understanding of the parties that recklessness was the only mental state required for these crimes renders this case indistinguishable from a jury trial in which the jury is charged, without objection, under an incorrect or subsequently invalidated standard (*see People v Danielson*, 9 NY3d 342, 349 [2007]; *People v Johnson*, 43 AD3d 288, 291-292 [2007], *revd on other grounds* 10 NY3d 875 [2008]). Because for this reason we must weigh the evidence in light of the elements of the depraved indifference crimes as they were defined in *Register*, I agree with the majority that the verdict convicting defendant of those crimes is not against the weight of the evidence.

After making clear that it is not reviewing in the interest of justice defendant's unpreserved challenge under *Feingold*, the majority alternatively holds as follows: "Even subjecting [defendant's] conviction to analysis under *Feingold*, . . . we conclude that the evidence nevertheless supports a finding that his conduct evinced a depraved indifference to human life." We need not and should not decide, however, whether the evidence is sufficient under *Feingold*. By not deciding that issue, we would avoid the need to address and decide the question of law that is at the core of defendant's challenge to the sufficiency of the evidence under *Feingold*: whether voluntary intoxication remains irrelevant as a defense in a prosecution for depraved indifference murder.

Under the last sentence of Penal Law § 15.05 (3), a person who is unaware solely by reason of voluntary intoxication that his conduct creates a particular risk nonetheless acts recklessly with respect to that risk. In *Register*, this sentence played a decisive role in the Court's conclusion that the requirement of conduct evincing a depraved indifference to human life "does not create a new and different *mens rea* . . . which can be negatived by evidence of intoxication" (60 NY2d at 279; *see also id.* at 275-276).

However, because voluntary intoxication does not negate the mens rea of recklessness, it hardly follows that it does not or cannot negate the distinct mens rea of depraved indifference, "an additional requirement of the crime—beyond mere recklessness and risk—which in turn comprises both depravity and indifference" (*People v Suarez*, 6 NY3d 202, 214 [2005]; *see Feingold*, 7 NY3d at 294). If voluntary intoxication remains irrelevant under *Feingold* as a defense to a depraved indifference prosecution, it must be that an individual can be depravedly indifferent to a risk without being aware of it. How that could be is far from obvious. Notably, as defendant stresses, a panel of the Third Department has concluded that voluntary intoxication can negate the mens rea of depraved indifference (*People v Coon*, 34 AD3d 869, 870 [2006] ["as defendant was too intoxicated to form a specific criminal intent, he also would be incapable of possessing the culpable mental state necessary to prove depraved indifference"]).

As I read the majority's opinion, it does not decide this question sub silentio. After all, although it correctly notes the specific holding of *Register* on the irrelevance of voluntary intoxication in a prosecution for depraved indifference murder, it does not

mention, let alone discuss, the issue of whether that holding remains good law after *Feingold*. Nor does the majority mention that defendant argues at length that under *Feingold* the mens rea of depraved indifference can be negated by evidence of intoxication, or state whether it agrees with the conclusion of the Third Department in *Coon*.[1] Clearly, moreover, the issue is best left for another day.

Relatedly, I would reject as unpreserved defendant's current claim that he was deprived of his constitutional right to present a defense because the trial court improperly precluded the testimony of his expert regarding his chronic alcoholism. At trial, defendant never alerted the trial court to his current claim that the testimony related to a depraved indifference mens rea. Rather, defendant argued that the testimony bore on the mens rea of recklessness and on whether the objective circumstances surrounding his reckless conduct rose to the level of depraved indifference. Having never protested that the testimony related to a depraved indifference mens rea, defendant's claim is not preserved for review (CPL 470.05 [2]; *People v Johnson*, 43 AD3d at 291-292, *revd on other grounds* 10 NY3d 875 [2008]), and I would not review it in the interest of justice.

I disagree in part with the majority's statement that "defendant's mental state at the time of the collision . . . is not dispositive; rather, culpability is appropriately assessed at the time defendant made the conscious decision to embark on a course of conduct that inevitably resulted in his operation of a motor vehicle while in a state of extreme intoxication." A defendant's actions prior to the commission of the actus reus allegedly constituting the crime charged certainly can shed light on his mens rea at the time of the actus reus, but the defendant's guilt turns on what his mens rea was at the time of the actus reus (*cf. People v Gallagher*, 69 NY2d 525 [1987]). I agree that defendant's mens rea at the exact moment of the collision is not determinative. The focus, however, must be on defendant's mens rea when he engaged in the conduct—which included driving at high speed on city streets through red lights—that caused the

---

· **1.** The majority, however, prefaces the two sentences it devotes to the opinion in *People v Coon* with a confounding sentence. Thus, it writes, *"People v Coon . . . , relied upon by the concurrence*, is distinguishable" (emphasis added). My point of course is that we need not and should not decide whether voluntary intoxication can negate the mens rea of depraved indifference. Accordingly, and just as obviously, I do not "rel[y]" upon *People v Coon*.

victim's death.[2] Thus, "culpability is appropriately assessed" at that time, not at any earlier point in time when, according to the majority, "defendant made the conscious decision to embark on a course of conduct that inevitably resulted in his operation of a motor vehicle while in a state of extreme intoxication."

I also disagree that any "conscious decision to drink" defendant made *"inevitably* resulted in his operation of a motor vehicle while in a state of extreme intoxication" (emphasis added). This unexplained assertion that defendant's operation of a motor vehicle while in a state of extreme intoxication was the inevitable consequence of some earlier decision is unsupported by the evidence and contrary to common experience. Finally, no testimony was elicited at trial about defense counsel's contention in his memorandum of law that the evidence at trial would prove that defendant was "barely conscious due to his intoxication" (emphasis deleted). Accordingly, the majority errs in considering that contention to be evidence (indeed, an admission by defendant) that he was "barely conscious" as a result of his intoxication.

FRIEDMAN and WILLIAMS, JJ., concur with TOM, J.P.; McGUIRE, J., concurs in a separate opinion.

Judgment, Supreme Court, New York County, rendered June 29, 2005, affirmed.

---

**2.** That mens rea need not be identical to or as culpable as the mens rea of a person who decides to drive after drinking to excess. Obviously, not everyone who drives while intoxicated creates the same risk of death to others that defendant's driving created.