■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ANTHONY GRIFFIN, Appellant. [882 NYS2d 406]—

Judgment, Supreme Court, Bronx County (Martin Marcus, J.), rendered October 24, 2006, convicting defendant, after a jury trial, of murder in the second degree and sentencing him to a term of 25 years to life, unanimously affirmed.

On October 21, 2002, Ariann Jackson returned to her apartment from work to find the lifeless body of Chauncey Warren, her 23-year-old boyfriend who had been stabbed to death. Although defendant was indicted for the crime on theories that included the commission of the homicidal act while acting in concert with another, the case was presented to the jury on the theory that it was defendant himself who fatally stabbed Warren. Defendant asserts on this appeal that his conviction was against the weight of the evidence.

At trial, the People presented evidence that Warren had been very close with his uncle, Lester Dixon, and lived with him in 2001. Dixon knew defendant as a person his nephew grew up with. In the summer of 2002, Dixon learned that Warren was having a problem with the Murder Unit, a group of neighborhood drug dealers. The problem stemmed from the group's suspicion that Warren had slashed the face of someone named Jason. Accompanied by his uncle, Warren met with and explained to the Murder Unit that it was defendant and not he who committed the assault. The Murder Unit instructed Warren to notify them as soon as he saw defendant. On the way home, Warren met an acquaintance whom he told about the encounter with the Murder Unit and their instruction for him to deliver defendant up to them.

For about a year before his death, Warren lived with Jackson in her first-floor apartment. Jackson's mother, Britt Minott, and her stepfather, Nathaniel Mouzon, lived in an apartment on the second floor of the building. In keeping with her weekly routine, Jackson thoroughly cleaned the apartment, including the bathroom sink and mirror, on Sunday, October 20, 2002, the day before the murder. The next day, Jackson left at 7:30 A.M. to go to work, leaving Warren at the apartment. Warren had to go to court that day to appear on a summons. At about 10:30 A.M., defendant and another man approached Mouzon in front of the building and said they were looking for Warren. Mouzon rang Warren's doorbell and got no response. The two men waited outside until Warren returned about half an hour later. At that time Warren entered his apartment with defendant and the other visitor. At about 1:00 P.M., Warren unlocked the door to allow Mouzon access to an electrical outlet for a power tool he was using to fix a lock in the hallway. Upon entering the apartment, Mouzon saw Warren and the other man in the living room and heard someone else playing video games. Mouzon finished using the outlet at 1:40 P.M. when he believed Warren locked the door. At about 3:00 P.M., Mouzon and Minott went to a check-cashing establishment and returned to the building 10 minutes later. Mouzon, who had been in the hallway outside of Warren's door or in front of the building for the entire day up to that point, did not see defendant or the other visitor leave Warren's apartment.

Shortly after 6:20 P.M., Jackson returned to her apartment to find the front door unlocked. She then saw Warren's dead body in the living room with a very deep cut in the neck. The apartment had been ransacked and Warren's pinky ring, chain and a Play Station video game system were missing. The kitchen

window, which led to a back alley fire escape, was open. Flower pots by the window were in disarray and there was blood on the curtain.

Jackson never again stayed at the apartment, but returned to it on November 13 with Mouzon and Minott to retrieve some of her clothing. At that time, Jackson noticed a plastic bag containing a football jersey and a grey hooded sweatshirt. Both garments were bloodstained and neither belonged to Warren or Jackson. Jackson, however, remembered seeing defendant wearing the sweatshirt when she and Warren encountered him in the street two days before the murder. After receiving a call from Jackson, Detective Robert D'Amico took possession of and vouchered both items of clothing, which were later tested for DNA.

An autopsy revealed that Warren, who was considerably larger than defendant, suffered a combination of 21 stab wounds and slashes to his body. Among the wounds were three deep stab wounds to the neck, which perforated jugular veins, and two stab wounds to the right and left sides of the back, which respectively caused the chest cavity to fill with blood and the left lung to collapse. Dr. James Gill of the Office of the Chief Medical Examiner opined that each of these five wounds was potentially fatal in itself, and the stab wounds to the back occurred first.

During the course of the investigation, a fingerprint lifted from the bathroom mirror was matched to defendant. On May 5, 2003, D'Amico interviewed defendant in North Carolina. After waiving his *Miranda* rights, defendant stated that he had traveled to New York from North Carolina around October 21, 2002. Over the following week, defendant and Warren saw each other every day, often playing video games at Warren's apartment. Defendant also told D'Amico that the Murder Unit was looking for him and had issued a $20,000 "hit" on him because of Jason's slashing. Defendant said he thought Warren might have told someone that he was back in New York. Pursuant to a search warrant, D'Amico took four swabs of saliva from defendant's mouth for DNA testing. The samples were secured and brought to New York for laboratory analysis.

Dr. Mechthild Prinz, the Director of the Department of Forensic Biology of the Office of the Chief Medical Examiner, testified that the saliva samples recovered from defendant were used to create a DNA profile of him. Similarly, a DNA profile of Warren was created from a sample of his blood. DNA profiles of bloodstains on the jersey and the hooded sweatshirt matched Warren. The sweatshirt was also turned inside out and scraped

for skin cells in the areas of the neck and armpits. Dr. Prinz opined that the armpit DNA profile did not come from Warren, but was consistent with defendant's DNA profile.

At the prosecution's request, the case was not submitted to the jury on an acting-in-concert theory. Rather, the jury was instructed that the prosecution had to prove defendant caused Warren's death and did so by stabbing and slashing him with a sharp object. Defendant asserts that in this circumstantial evidence case his conviction of second degree intentional murder is against the weight of evidence.

Our weight-of-evidence review requires us first to determine whether an acquittal would not have been unreasonable. If so, we must next weigh conflicting testimony, review any rational inferences that may be drawn from the evidence and evaluate the strength of such conclusions. Then, based on the weight of the credible evidence, we must next decide whether the jury was justified in finding defendant guilty beyond a reasonable doubt (*People v Danielson*, 9 NY3d 342, 348 [2007]). In conducting the required analysis, based upon the evidence adduced at trial, we determine that an acquittal of the charge of second-degree intentional murder on a sole-actor theory would have been unreasonable. Even if a contrary conclusion would have been reasonable, we conclude that the verdict was not against the weight of the credible evidence. As noted above, testimony at trial placed defendant at Warren's apartment during a period when the crime could have been committed. The DNA analyses of the bloodstains and armpit skin cells found on the gray hooded sweatshirt provided a compelling link between defendant and the stabbing. Defendant's attack on the credibility of Jackson's testimony that she saw him wearing the sweatshirt shortly before the murder is unavailing. Under a weight-of-evidence analysis, a court does not take the place of the jury in passing on questions of the reliability of witnesses and the credibility of testimony, instead it gives great deference to the jury's findings (*see People v Romero*, 7 NY3d 633, 642, 643 [2006]). As indicated above, it was determined that the fatal wounds to Warren's back were the first to be inflicted. This factor, considered in conjunction with the element of surprise, suffices to allow the jury to discount Warren's relatively larger size as a basis for a reasonable doubt that defendant acted alone. Accordingly, the record amply supports the jury's conclusion that defendant himself committed the homicidal act. To the extent defendant is challenging the legal sufficiency of the evidence, that claim has not been preserved, inasmuch as his trial motion to dismiss was based on a different ground (*see People v Wells*, 53

AD3d 181, 188-189 [2008], *lv denied* 11 NY3d 858 [2008]; *People v Crawford*, 38 AD3d 680 [2007], *lv denied* 9 NY3d 842 [2007]). We decline to reach the issue in the interest of justice. As an alternative holding, we also reject it on the merits. Concur—Tom, J.P., Andrias, Nardelli, Buckley and DeGrasse, JJ.