Shulman, J.
(dissenting). Defendant was convicted, after a bench trial, of third-degree criminal trespass upon evidence, largely undisputed: that police officers conducting a “vertical sweep” of a drug prone building in a public housing development known as the Taft Houses observed defendant enter the building at about 6:50 p.m. on a December evening, proceed through the lobby to an elevator and, within a 10-minute period, appear in three different hallways on the building’s upper floors; that “No Trespassing” signs were displayed near the building’s entranceways and that the entrance doors generally were locked; and that defendant, in response to police inquiries, acknowledged that he did not live in the building, explaining that he intended to visit his aunt — though unable to provide her name or apartment number — and that he had an unnamed friend or friends in the building.
The primary defense asserted at trial, as defense counsel framed it in her opening statement, was whether defendant had “made a mistake by walking into the wrong building.” In this connection, defendant testified that he had previously made arrangements to have dinner with his “very good friend,” one Laurie Holder, in her apartment at 6:00 p.m. on the evening in question. The trial record shows, and it is undisputed, that *79 Holder actually lives in a Taft Houses building known as 1694 Madison Avenue, located across the street from the building (65 East 112th Street) in which defendant was arrested. Despite admittedly having visited the Holder residence on no fewer than 10 to 15 prior occasions and being “completely familiar” with the surrounding area, defendant maintained that he mistakenly entered the wrong building, gaining access “as another tenant or guest was exiting.” Defendant came to realize his mistake when, after taking the elevator to the 18th floor and walking down the staircase to the 14th floor,[1] he could not find Holder’s apartment. Defendant testified as follows as to what occurred next:
“I figured I was in the wrong building so I had started to exit the building by the stairs because to wait . . . the elevator just takes [too] long. So I was going to take the stairs down and while I was taking the stairs I . . . got out on the 11th floor so I could make the phone call [to explain his tardy arrival to Holder] because I didn’t really think that the stairs would be safe to go all the way downstairs and also I had to make the phone call anyway.”
The police approached defendant in the 11th floor hallway before he could call Holder and, in response to their questioning about his presence in the building, defendant told the officers that he was visiting a “close friend,” that his “aunt lives in the building,” and that he “had a place to be,” but “had the floor wrong.” Asked on direct examination to “clarify” the nature of his relationship with Holder, defendant stated that, while there is no “blood relation” between them, Holder is the mother of a close female friend of his and that he generally calls Holder “mom” because she is older than he is and “that is how [Holder’s] daughter introduced her to [him].” As to why he referred to Holder as his “aunt” in response to police questioning, defendant testified that he used that term so as to convey to the officers that “it was more than ... a buddy of mine or a pal that I was visiting. It was somebody older who was very close to me.” Defendant acknowledged on cross-examination that this occasion marked the “only time” he ever referred to Holder as his aunt. Defendant also testified that, immediately prior to his arrest, he “humbly” asked the police “for some courtesy because [he] was on probation.”
*80 Called as a defense witness, Holder offered testimony tending to essentially confirm defendant’s account of the timing and purpose of the (allegedly) planned apartment visit and the nature of her relationship with defendant. As to the latter point, Holder appeared to waffle, initially characterizing their relationship as merely “pretty close,” but ultimately describing defendant as the “son [she] never had,” a “son,” it bears mention, whose precise age or birth date Holder could not identify. Further, Holder conceded that, despite defendant’s failure to appear at the appointed hour, she did not call his cell phone at any point that evening to find out if he was all right, and only came to know of defendant’s arrest sometime after 8:30 p.m. that night, when she (or, more precisely, her husband) received a call from an officer at the police precinct.
The arresting police officer, in testimony elicited on rebuttal, denied defendant ever indicated he was lost.
Defendant’s arguments relating to the legal sufficiency of the evidence supporting his criminal trespass conviction are unpreserved for appellate review inasmuch as he failed to move for a trial order of dismissal on these or any other grounds (see People v Gray, 86 NY2d 10 [1995]), and I would not review them in the interest of justice. As an alternative holding, I would reject them on the merits. When the evidence is viewed in the light most favorable to the prosecution and given the benefit of every favorable inference (see People v Ford, 66 NY2d 428, 437 [1985]), it clearly sufficed to establish beyond a reasonable doubt that the dwelling premises was “fenced or otherwise enclosed in a manner designed to exclude intruders” (Penal Law § 140.10 [a]; see and compare People v Moore, 5 NY3d 725 [2005]) and that defendant knowingly entered or remained unlawfully there (see Matter of Lonique M., 93 AD3d 203 [2012]; see also People v Williams, 16 AD3d 151 [2005], lv denied 5 NY3d 771 [2005] [probable cause for criminal trespass arrest found where defendant claimed to be visiting his cousin in a Housing Authority building, but was unable to provide an apartment number and falsely identified a woman in the lobby as his cousin]). The credited police testimony detailing defendant’s suspicious behavior in the hallways of the public housing building, his ready admission that he did not live in the building and his inability to identify the name(s) or apartment number(s) of the person(s) he purportedly was attempting to visit was sufficient to establish, at least circumstantially, that he entered or remained unlawfully in the building without the requisite *81 license or privilege (see Penal Law § 140.00 [5]; Matter of Lonigue M., 93 AD3d 203 [2012], supra; see also People v Lozado, 90 AD3d 582 [2011], lv denied 18 NY3d 925 [2012]; People v Quinones, 173 AD2d 395 [1991], lv denied 78 NY2d 972 [1991]). I find unavailing defendant’s apparent argument that the trial court, in determining whether the prosecution met its burden to establish guilt beyond a reasonable doubt, could not properly rely on defendant’s on-the-scene statements. Having, by his own account, affirmatively explained his presence in the building in response to police questioning, and indeed having relied on that explanation as the centerpiece of his defense at trial, defendant may not now be heard to argue that the trial court was precluded from drawing any inferences adverse to him from that evidence on the theory that it was not his obligation, in the first instance, to explain his presence (see Matter of Lonigue M., 93 AD3d 203, 207 [2012]; cf. Matter of Daniel B., 2 AD3d 440 [2003]; Matter of James C., 23 AD3d 262 [2005]).
Nor, respectfully, can I join the majority’s conclusion that defendant’s conviction was against the weight of the evidence (see People v Danielson, 9 NY3d 342 [2007]). In conducting an independent review of the weight of the evidence, a reviewing court must assess in a neutral light “all the credible evidence” (People v Bleakley, 69 NY2d 490, 495 [1987]), including evidence presented by the defense, to ascertain whether such evidence was accorded the proper weight by the factfinder, here the trial court. Under a weight-of-evidence analysis, the court “does not take the place of the [factfinder] in passing on questions of the reliability of witnesses and the credibility of testimony” (People v Griffin, 63 AD3d 635, 638 [2009], lv denied 13 NY3d 835 [2009], citing People v Romero, 7 NY3d 633, 642, 643 [2006]), and instead must give “[g]reat deference ... to the fact-finder’s opportunity to view the witnesses, hear the testimony and observe demeanor” (see People v Mateo, 2 NY3d 383, 410 [2004], cert denied 542 US 946 [2004], quoting People v Bleakley, 69 NY2d at 495).
Upon reviewing the record here, I am satisfied that defendant’s conviction comported with the weight of the credible evidence. To be sure, a person who “honestly believes that he is licensed or privileged to enter[ ] is not guilty of any degree of criminal trespass” (People v Basch, 36 NY2d 154, 159 [1975]). The central question put before the trial judge, then, was whether defendant, assuming he was invited to visit Holder’s apartment, “honestly believe [d]” he had lawfully entered the *82 building housing that apartment pursuant to Holder’s consent. Resolution of that issue required the trial judge to make a credibility call, pure and simple. The court, in the end, rejected— justifiably, in my view — defendant’s explanation as to how it came about that, despite his avowed familiarity with the Taft Houses and their environs, he managed to get lost in the hallways and stairwells on the upper floors of the “wrong” Taft Houses building. The trial court’s decision to reject defendant’s trial testimony was well within its province as factfinder, particularly considering the various unanswered questions raised by the defense accounts, including why defendant (mis)identified Holder as his “aunt” to police; why, in initially attempting to exit the building, he initially chose to eschew the elevator in favor of descending at least 14 flights of stairs when he was already late for a dinner engagement; why he ultimately paused in his descent on the 11th floor hallway; and why Holder, if she in fact invited defendant to eat dinner at her apartment, made no effort whatsoever to call her supposed surrogate son to determine his whereabouts and safety.[2]
Because it does not “appear[ ] that the trier of fact has failed to give the evidence the weight it should be accorded” (People v Bleakley, 69 NY2d at 495), and given the lack of merit to defendant’s challenge to the facial sufficiency of the information, I respectfully dissent and vote to affirm the judgment of conviction.
Torres, J.E, and Hunter, Jr., J., concur; Shulman, J., dissents in a separate opinion.

. Defendant’s testimony on this point diverged from that of the arresting police officer, who stated that defendant, after being sighted in the lobby, was next seen on the 11th floor hallway and then, about eight minutes later, on the 18th floor hallway.

. Nor is a different result warranted under an “element-based” weight of the evidence review authorized by People v Danielson (9 NY3d 342 [2007], supra) since, as previously indicated, the People’s evidence proved the elements of third-degree criminal trespass beyond a reasonable doubt.