THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v FRANKLIN McPHERSON, Appellant. [932 NYS2d 85]—

At around midnight on October 18 to 19, 2007, the defendant went to the Island Rock nightclub in Hempstead with his girlfriend, a friend of his girlfriend, Delroy McCalla, and another individual, Roman Taylor. After drinking alcohol at the nightclub, the defendant and Taylor left and went to a nearby parking lot. McCalla testified that the defendant did not appear intoxicated at that time. According to McCalla, the defendant stated in the parking lot "I lost my shit," presumably referring to drugs, and the defendant became upset. The defendant went into the trunk of his car and searched for something. The defendant then began arguing with his girlfriend. At approximately 3:15 A.M., several witnesses heard gunshots, but no one reported having seen the defendant fire a gun. The defendant then angrily ordered McCalla to leave with his girlfriend, which McCalla did, driving the defendant's girlfriend home. The defendant and Taylor then entered the defendant's vehicle, with the defendant driving. When police officers arrived at the parking lot only minutes later, at about 3:20 A.M., the defendant had left, and the officers recovered several 9-millimeter shell casings in the parking lot.

Thereafter, at approximately 3:30 A.M., the defendant's vehicle was seen traveling west in the eastbound lanes of the Southern State Parkway at a speed of 70 to 75 miles per hour. According to numerous witnesses, the defendant's vehicle traveled in the wrong direction from about exit 19 to exit 13, a distance of approximately five miles. A witness observed the defendant driving directly at him while changing lanes. That witness had to immediately pull his vehicle onto the shoulder to avoid a collision. This witness saw that the defendant continued driving the wrong way, and the witness observed the other vehicles on the parkway "[s]plit apart" in order to get away from the defendant. The witness testified that the defendant "was steadily going, not braking, nothing. He was just going. He was speeding." Meanwhile, another witness, Police Sergeant Edward Schulze,

was also driving in the proper direction in the left eastbound lane of the parkway. As Sergeant Schulze passed exit 14, he observed the defendant's vehicle driving towards him "at a very, very high rate of speed," which caused Sergeant Schulze to "violently" turn his steering wheel to the right to avoid a collision. The defendant's car came within inches of Sergeant Schulze's vehicle. According to Sergeant Schulze, the defendant "made absolutely no effort to get out of the way."

Near exit 13, the defendant's vehicle, without ever having slowed down, collided with the victim's vehicle, killing the victim instantly and incinerating the victim's vehicle. When emergency services and police arrived on the scene and attempted to remove the defendant from his damaged vehicle, the defendant was agitated and his breath emitted a strong odor of alcohol. Following the defendant's arrest, a blood sample taken from him at 4:49 A.M., just over an hour after the accident, indicated that his blood alcohol content (hereinafter BAC) was 0.19%.

After the defendant was removed from his vehicle, the police began conducting an inventory search of the vehicle. The discovery of several 9-millimeter rounds in the trunk, however, transformed the search from inventory to investigatory, during which the police recovered a 9-millimeter semiautomatic pistol, what was later determined to be .395 grams of cocaine beneath the front passenger seat, and 41 rounds of 9-millimeter bullets contained in a partially loaded magazine and a box in the trunk. The gun recovered from the defendant's vehicle matched the shell casings found in the parking lot near the nightclub.

The defendant's contention that the evidence was legally insufficient to support his conviction of murder in the second degree and criminal possession of a weapon in the second degree is unpreserved for appellate review (see CPL 470.05 [2]; People v Hawkins, 11 NY3d 484, 492 [2008]; People v Gray, 86 NY2d 10 [1995]). In any event, viewing the evidence in the light most favorable to the prosecution (see People v Contes, 60 NY2d 620 [1983]), we find that it was legally sufficient to establish the defendant's guilt of those crimes beyond a reasonable doubt (see People v Heidgen, 87 AD3d 1016 [2011]). A person is guilty of depraved indifference murder when, "[u]nder circumstances evincing a depraved indifference to human life, he [or she] recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person" (Penal Law § 125.25 [2]).

We disagree with our dissenting colleague's view that there was no evidence that the defendant deliberately and purposefully proceeded the wrong way down the parkway, in recogni-

tion of the grave risk to human life, and with utter disregard for the consequences. Rather, viewing the evidence in the light most favorable to the prosecution, as we must (*see People v Contes*, 60 NY2d 620 [1983]), the testimony of the witnesses who observed the defendant speeding directly at them on the parkway, causing those witnesses to swerve in order to avoid a collision, demonstrates that the defendant's mental state was one of depraved indifference to human life (*see People v Feingold*, 7 NY3d 288, 294 [2006]).

The defendant asserts that his BAC content and intoxication rendered him unable to form the mental state of depraved indifference to human life. To the contrary, the evidence demonstrated that the defendant helped Taylor leave the nightclub. In addition, McCalla testified that when the defendant left the nightclub, the defendant "looked okay to [him]," "didn't look like intoxicated to me [*sic*]," and that the defendant "seemed like he could handle himself." The evidence did not establish that the defendant was too intoxicated to form the culpable mental state necessary to prove depraved indifference (*see People v Heidgen*, 87 AD3d at 1022 [involving an intoxicated motorist traveling the wrong way on a parkway, stating that the evidence "did not establish that the defendant was intoxicated to a degree of total oblivion or mania" so as to preclude the defendant from forming the requisite mental state]; *cf. People v Coon*, 34 AD3d 869, 870 [2006] [after a nonjury trial, trial court found the defendant "suffered an atypical idiopathic reaction to the substance such that, at the time of the attack, he was experiencing cocaine intoxication delirium"]). Thus, the record supports a view of the evidence that the defendant was coherent and able to form the requisite mens rea prior to leaving the parking lot.

Perhaps instructive on the import of the defendant's BAC content is *People v Wells* (53 AD3d 181 [2008]). In *Wells*, the intoxicated defendant drove through a red light, striking another vehicle and killing a passenger in that vehicle. The evidence adduced in that case further showed that, prior to the fatal collision, the defendant had struck a parked car and narrowly missed hitting another vehicle when he sped through a red traffic light. Following a nonjury trial, the defendant was convicted of, among other things, depraved indifference murder and assault in the first degree. On appeal, the Appellate Division, First Department, held that, applying the standards set forth in either *People v Register* (60 NY2d 270 [1983], *cert denied* 466 US 953 [1984]) or *People v Feingold* (7 NY3d 288 [2006]), the evidence was legally sufficient and the verdict was not

against the weight of the evidence (*see People v Wells*, 53 AD3d 181 [2008]). Thereafter, the United States District Court for the Southern District of New York denied the defendant's petition for a writ of habeas corpus (*see Wells v Perez*, 2011 WL 1453925, 2011 US Dist LEXIS 40712 [SD NY]). Two tests conducted approximately two hours after the incident revealed the defendant's BAC to be 0.25% and 0.27%, respectively. Thus, here, as in *Wells*, a defendant's statutory intoxication is not dispositive on the issue of whether a defendant was capable of forming the requisite mens rea.

Here, the evidence adduced at trial distinguishes this case from the cases relied upon by the defendant, including *People v Prindle* (16 NY3d 768 [2011]). In *Prindle*, the defendant, who was concerned about being arrested for the theft of a snowplow blade, led police on a 2¹/₂ to 4 mile chase while driving in and out of an oncoming lane of traffic. Ultimately, the defendant drove his van into another vehicle, killing a passenger. Also, in *Prindle* there was evidence that the defendant was attempting to evade the other cars inasmuch as he crossed over the double solid line and back numerous times. The Court of Appeals in *Prindle* determined that the evidence was legally insufficient to establish depraved indifference murder. Here, by contrast, the record does not suggest that the subject accident was the result of the defendant's attempt to flee from the police, and there was factual proof that the defendant had several opportunities to cease his procession towards oncoming traffic.

Similarly, *People v Valencia* (14 NY3d 927 [2010]), which also involved an intoxicated motorist traveling the wrong way on a parkway, can be distinguished. In *Valencia*, following a bench trial, the finder of fact made a specific finding that the defendant's intoxication rendered him "oblivious" to his travel upon a highway prior to the accident to form the culpable mental state of depraved indifference to human life at the time he collided with the complainants' vehicles. Thus, the trial court determined that the evidence did not support his conviction of assault in the first degree. That factual finding was not disturbed by this Court (58 AD3d 879 [2009]), and the Court of Appeals was without power to review it. Although the decision by the Court of Appeals in *Valencia* does not so indicate, the only legal issue addressed in the briefs and argued before the Court of Appeals was whether the defendant's intoxication was too temporally remote from his driving to permit his conviction of depraved indifference assault (14 NY3d 927). Here, the defendant's conviction of depraved indifference murder was not based upon his decision to begin drinking with knowledge that he

planned to drive later in the evening. Instead, the conviction in the instant case was established by the eyewitness testimony which, viewed in the light most favorable to the People, was sufficient to find that the defendant possessed an " 'utter disregard for the value of human life' " so as to render him as culpable as a person who intended the consequences of his actions (*People v Feingold*, 7 NY3d at 298 [dissent of Ciparick, J.], quoting *People v Suarez*, 6 NY3d 202, 214 [2005]). Moreover, *Valencia* is factually distinguishable in that there was no evidence in that case that the defendant drove past various other drivers who had to swerve to avoid hitting him prior to the fatal collision.

We do not believe that *Prindle* and *Valencia* stand for the proposition that a defendant who is per se intoxicated (*see* Vehicle and Traffic Law § 1192), and drives into oncoming traffic resulting in a fatality, can never be found guilty of depraved indifference murder or assault because such a defendant is incapable of forming the requisite mens rea of depraved indifference to human life. Rather than supporting the defendant's position, the above-cited cases merely illustrate that, in situations where a defendant is alleged to have acted with depraved indifference to human life while operating a motor vehicle, the nature of the evidence presented is crucial. We agree that when presented with a proper factual predicate, a defendant can be found not guilty of depraved indifference murder as a matter of law. However, we part with the dissent in that we disagree that the facts in this case mandate an acquittal as a matter of law. The facts as articulated above support the defendant's conviction of murder in the second degree. Therefore, these cases are all fact determinative. We also note that the state of the law in this area has yet to be fully developed.

Our dissenting colleague correctly notes that, in 2007, the Legislature created the new crime of aggravated vehicular homicide, a class B felony (*see* Penal Law § 125.14; L 2007, ch 345). We agree that the new crime—which was not in effect at the time of the incident sub judice—was intended to address drunk drivers who kill, but act with a mental state that does not rise to the level of depraved indifference to human life. We also acknowledge that it is unusual for one to be guilty of depraved indifference murder when driving while intoxicated because of the decisions of the Court of Appeals, previously cited, that limited its application. We also agree with our dissenting colleague that the new crime was not needed to rectify a purported *legal impossibility* of a drunk driver being convicted of depraved indifference murder. A review of the legislative bill jacket supports this view (*see* Bill Jacket, L 2007, ch 345).

The dissent posits that in order to convict the defendant of depraved indifference murder, the jury would have had to have found that the defendant was suicidal. This assertion is flawed because it is not necessary for the defendant to have intended to kill himself when he drove the wrong way down the parkway. Indeed, to find the defendant guilty of depraved indifference murder, a rational trier of fact would not need to find that the defendant had a specific, conscious intent to cause a certain result (*see People v Gonzalez*, 1 NY3d 464, 467 [2004] ["Depraved indifference murder differs from intentional murder in that it results not from a specific, conscious intent to cause death, but from an indifference to or disregard of the risks attending defendant's conduct"]).

Under the facts presented here, the defendant's action of driving his vehicle towards oncoming traffic on the parkway for approximately five miles constituted reckless conduct which carried with it a grave risk of death and evinced a depraved state of mind. The negation of this intent, by extreme intoxication, is not supported by the record. For example, the defendant helped Taylor into the car, he searched for his missing drugs, and McCalla testified that the defendant did not appear intoxicated. Thus, we cannot conclude that the evidence of the defendant's guilt of murder in the second degree was legally insufficient to support that conviction. Moreover, upon our independent review pursuant to CPL 470.15 (5), we are satisfied that the verdict of guilt as to depraved indifference murder was not against the weight of the evidence (*see People v Danielson*, 9 NY3d 342 [2007]).

Likewise, we find that the evidence was legally sufficient to establish the defendant's guilt of criminal possession of a weapon in the second degree, and that the verdict of guilt as to that crime was not against the weight of evidence.

Contrary to the defendant's contention, the hearing court properly denied that branch of his omnibus motion which was to suppress the physical evidence seized from his vehicle. The evidence adduced at the suppression hearing demonstrated that the search of the defendant's vehicle was authorized as a warrantless search falling within the automobile and emergency exceptions to the warrant requirement (*see Arizona v Gant*, 556 US 332 [2009]; *People v Molnar*, 98 NY2d 328, 332 [2002]; *People v Blasich*, 73 NY2d 673, 678 [1989]; *People v Belton*, 55 NY2d 49, 53-55 [1982]; *People v Mitchell*, 39 NY2d 173 [1976], *cert denied* 426 US 953 [1976]).

Further, the defendant was not deprived of the effective assistance of counsel, as defense counsel provided meaningful repre-

sentation (*see People v Benevento*, 91 NY2d 708, 712 [1998]; *People v Baldi*, 54 NY2d 137, 147 [1981]).

The sentence imposed was not excessive (*see People v Suitte*, 90 AD2d 80, 85-86 [1982]). Florio, J.P., Dickerson and Leventhal, JJ., concur.

Belen, J., dissents and votes to modify the judgment, on the law, on the facts, and as a matter of discretion in the interest of justice, by reducing the conviction of murder in the second degree to manslaughter in the second degree, and vacating the sentence imposed on that count and, as so modified, to affirm the judgment and remit the matter to the County Court, Nassau County, for resentencing on that count with the following memorandum.

Belen, J. (dissenting). The defendant spent the evening of October 18, 2007, drinking with his girlfriend, cousin, and a friend at a nightclub in Hempstead, New York. According to the friend, in a parking lot near the nightclub later that evening, the defendant became upset at having lost something, appeared to be looking for the lost item in the trunk of his vehicle, and began arguing with his girlfriend. At approximately 3:15 A.M., several witnesses heard gunshots, although no witness reported seeing the defendant fire a gun. The defendant then angrily ordered the friend to leave with his girlfriend. The friend complied and drove the defendant's girlfriend home. The defendant and his cousin then entered the defendant's vehicle, with the defendant driving. Meanwhile, when police officers arrived at the parking lot only minutes later, at about 3:20 A.M., the defendant was no longer there; the officers recovered several 9-millimeter shell casings in the parking lot.

Minutes later, at approximately 3:30 A.M., the defendant's vehicle was seen traveling west in the eastbound lanes of the Southern State Parkway at a speed of 70 to 75 miles per hour. According to numerous witnesses, the defendant's vehicle traveled in the wrong direction from approximately exit 19 to exit 13, a distance of approximately five miles, periodically changing lanes, which forced other drivers to swerve aside to avoid a collision. Around exit 13, the defendant's vehicle, without ever having slowed down, collided with the victim's vehicle, killing the victim instantly and incinerating the victim's vehicle. The collision totaled the defendant's vehicle, with the defendant and his cousin pinned inside.

When emergency services and police arrived and began attempting to remove the defendant from his vehicle, the defendant was agitated and his breath emitted a strong odor of alcohol. After the defendant was arrested, a blood sample taken from

him at 4:49 A.M., just over one hour after the accident, indicated his blood alcohol content to be 0.19%.

"The standard for reviewing the legal sufficiency of evidence in a criminal case is whether 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt' " (*People v Contes*, 60 NY2d 620, 621 [1983], quoting *Jackson v Virginia*, 443 US 307, 319 [1979]).

Under the Penal Law, "[a] person acts recklessly with respect to a result or to a circumstance . . . when he [or she] is aware of and consciously disregards a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation" (Penal Law § 15.05 [3]). Proof of intoxication "will not negate the presence of a 'reckless' mental state" (*People v Johnson*, 277 AD2d 702, 704 [2000]; *see* Penal Law § 15.05 [3]; *People v Lampon*, 38 AD3d 682, 682-683 [2007]). Rather, "[a] person who fails to perceive a substantial and unjustifiable risk by reason of his [or her] intoxication acts recklessly" (*People v Elysee*, 12 NY3d 100, 105 [2009]).

In 2007, the Legislature created the new crime of aggravated vehicular homicide (*see* L 2007, ch 345), a class B felony punishable by an indeterminate prison sentence ranging from 8⅓ to 25 years of imprisonment (*see* Penal Law § 70.00 [2] [b]; [3] [b]; § 125.14). Notably, this statute provides, in pertinent part, that a person is guilty of aggravated vehicular homicide if he or she caused the death of at least one person while recklessly driving a vehicle and having a blood alcohol content of .18% or higher (*see* Penal Law § 125.14). Further, upon proof that the defendant operated a motor vehicle "while unlawfully intoxicated or impaired" by the use of alcohol and/or drugs, there "shall be a rebuttable presumption" that as a result of such intoxication or impairment, the defendant operated the motor vehicle in a manner that caused death to one or more persons (Penal Law § 125.14 [7]). This statute is not at issue here since the crimes at bar occurred approximately two weeks before the statute's effective date. However, it is of note that in a letter to then Governor Eliot Spitzer, the President of the District Attorneys Association of the State of New York described this new law as filling in "a glaring gap in the statutory scheme to address drunk drivers who kill . . . Currently, the law contains specific vehicular homicide sections that top out at a C felony which is punishable by a minimum sentence of probation and a maximum

sentence of five to fifteen years incarceration . . . Missing is an appropriate charge for the most egregious circumstances short of depraved indifference. The proposed B Felony would only be available in rare, well defined situations where a driver kills while operating with criminal negligence and is intoxicated and in addition is either severely intoxicated, has a proven history of driving drunk or has killed or seriously injured multiple victims . . . *Recent court decisions have so limited the application of the depraved indifference statutes to vehicular crimes as to make them inapplicable*" (Letter from President Michael E. Bongiorno of the District Attorneys Assoc of State of NY, June 15, 2007, Bill Jacket, L 2007, ch 345, at 15-16, [emphasis added]). Similarly, in her letter to then Governor Spitzer's counsel, the Nassau County District Attorney stated, "[t]he scale for vehicular homicides will now appropriately include a Class B felony for drivers who are drunk and exhibit one or more of the aggravating factors listed in the bill. *This legislation is urgently needed and will remove the unjust gap between the vehicular manslaughter and the nearly unattainable murder charge*" (Letter from Nassau County District Attorney Kathleen M. Rice, June 29, 2007, Bill Jacket, L 2007, ch 345, at 22 [emphasis added]). While the new statute attempts to close the gap in the statutory scheme for drunk drivers who kill, I do not cite it to suggest that depraved indifference murder can never be established against a drunk driver. It is not legally impossible to do so, but the facts in this case in no way support a finding of depraved indifference murder.

A person who acts with depraved indifference has no specific, conscious intent to cause a specific result, i.e., the death of another person or persons, but possesses the mens rea of being indifferent to, unconcerned with, and/or acting with complete disregard of the grave risks of death created by his or her conduct (*see* Penal Law § 125.25 [2]; *People v Feingold*, 7 NY3d 288, 294, 296 [2006]; *People v Gonzalez*, 1 NY3d 464, 467-468 [2004]). "[D]epraved indifference is best understood as an utter disregard for the value of human life—a willingness to act not because one intends harm, but because one simply doesn't care whether grievous harm results or not. Reflecting wickedness, evil or inhumanity, as manifested by brutal, heinous and despicable acts, depraved indifference is embodied in conduct that is 'so wanton, so deficient in a moral sense of concern, so devoid of regard of the life or lives of others, and so blameworthy' as to render the actor as culpable as one whose conscious objective is to kill" (*People v Suarez*, 6 NY3d 202, 214 [2005], quoting *People v Russell*, 91 NY2d 280, 287 [1998]). "To rise to the level of depraved indifference, the reckless conduct must be so wanton,

so deficient in a moral sense of concern, so devoid of regard of the life or lives of others, and so blameworthy as to warrant the same criminal liability as that which the law imposes upon a person who intentionally causes the death of another" (*People v Gonzalez*, 1 NY3d at 468-469 [internal quotation marks omitted]; *see e.g. People v Sanchez*, 98 NY2d 373 [2002] [firing a gun from behind a partially closed door toward an area where children were playing]; *People v Gomez*, 65 NY2d 9 [1985] [driving a vehicle several blocks at excessive speeds and hitting other vehicles and driving onto sidewalks; continuing to drive even after striking and killing a child riding a bicycle on a sidewalk; refusing passenger's entreaties to stop on the ground that he had already killed someone, after which the defendant struck and killed a second child riding a bicycle on a sidewalk]; *People v Jernatowski*, 238 NY 188 [1924] [firing a gun into a home where the defendant knew people were present]).

The horrific consequences of the defendant's reckless conduct of driving a vehicle while highly intoxicated cannot be understated. However, for the reasons set forth below, as a matter of law, the evidence was not legally sufficient to establish that he acted with depraved indifference. Accordingly, upon reaching this issue in the interest of justice, I would reduce his conviction for depraved indifference murder to manslaughter in the second degree, vacate the sentence imposed on that count, and remit the matter for resentencing on that count.

To reiterate, the defendant, who had a blood alcohol content more than twice the legal limit, drove at night on a parkway for several miles in the wrong direction at a high rate of speed. Although several oncoming drivers swerved out of the defendant's path over the course of several miles, the People produced no evidence at trial which demonstrated, beyond a reasonable doubt, that the defendant understood that he was driving the wrong way down the parkway prior to the head-on collision, with utter disregard for the consequences, as might be evident with, for example, evidence that the defendant's vehicle continued on its course after colliding with an object or other vehicle (*see People v Gomez*, 65 NY2d 9 [1985]; *cf. People v Carrington*, 30 AD3d 175 [2006]). In short, there is no evidence that the defendant deliberately drove his vehicle the wrong way down the parkway (*see People v France*, 57 AD2d 432, 434 [1977]).

Moreover, even accepting that the defendant was attempting to flee the police who responded to reports of gunfire in the parking lot near the nightclub, from which one could infer that his reckless driving resulted from his attempt to elude capture

by the police, it does not follow that his conduct evinced a depraved indifference to human life (*see People v Prindle*, 16 NY3d 768 [2011]; *People v France*, 57 AD2d at 434; *see also People v Heidgen*, 87 AD3d 1016, 1034-1035 [2011]).

The majority's attempt to distinguish *People v Valencia* (14 NY3d 927 [2010]) is unavailing. In *Valencia*, the evidence demonstrated that the defendant's blood alcohol content was approximately three times more than the legal limit, he drove at night in the wrong direction of the Wantagh State Parkway at a high rate of speed, and did not stop or slow down despite attempts by other drivers to warn him of the dangers he was creating. After traveling four miles, the defendant crashed head-on into one vehicle and then careened into another car. The Court of Appeals held that such evidence, which is factually indistinguishable from the instant case, demonstrated intoxication and reckless driving, but not depraved indifference and, accordingly, affirmed this Court's vacatur of the defendant's conviction and the sentence imposed thereon for assault in the first degree (*id., affg* 58 AD3d 879 [2009]).

I am also unconvinced by the majority's attempt to limit the holding of *Valencia* based on the assertion that the briefs submitted to the Court of Appeals argued only "whether the defendant's intoxication was too temporally remote from his driving to permit his conviction of depraved indifference assault." The majority (memorandum) opinion in *Valencia* is clear, stating, "[t]here is insufficient evidence to support a conviction for depraved indifference assault. The trial evidence established only that defendant was extremely intoxicated and did not establish that he acted with the culpable mental state of depraved indifference" (14 NY3d at 927-928). The majority opinion clearly did not limit itself to the issue of temporal remoteness between the defendant's act of drinking to the point of extreme intoxication and the later act of operating a vehicle.

Further, in her concurring opinion, Judge Graffeo explained:

"The Appellate Division reversed the first-degree assault conviction, concluding that defendant's state of mind before he drove home was too remote in time from the car crash. The reversal of that conviction reduced defendant's culpability from a class B felony to the class D felony of second-degree assault and a five-year determinate prison sentence.

"*We are now affirming* the reduction [of the conviction for assault in the first degree] to assault in the second degree, *but on narrower grounds,* with which I concur, *because of the lack of evidence to support all the elements of depraved indifference assault*" (*id.* at 928 [Graffeo, J., concurring] [emphasis added]).

The only discussion of the temporal remoteness issue was set forth in Judge Jones's concurrence, in which he initially stated, "[w]hile I agree with the result in the majority's memorandum, I write separately to express my position on the necessity of a temporal connection between mens rea and actus reus in the context of depraved indifference offenses" (*id.* at 931 [Jones, J., concurring]). Judge Jones noted that in traditional Anglo-American law, there must be a concurrence between the mens rea and actus reus (*id.* at 933). Reviewing the evidence at bar, he agreed with our determination that there was no such concurrence between the mens rea of depraved indifference assault at the time of the collision and the actus reus of the defendant's earlier drinking (*id.* at 934). Accordingly, he concluded that the "defendant's state of mind when he consumed the alcohol was too temporally remote from the act of driving to support a conviction of assault in the first degree" (*id.*).

As one commentator has explained:

"Although intoxication will not negate recklessness, it can negate the additional *mens rea* required for 'depraved indifference.' In *People v. Valencia*, the Court of Appeals held that the culpable mental state of depraved indifference was not established by evidence showing only that the defendant was extremely intoxicated when his driving caused a fatal accident. The defendant's emotional state before or after the crime, which was previously considered relevant to recklessness but not to 'depraved indifference,' is presumably now relevant to both mens reas" (Fahey, 6 NY Prac, Criminal Law § 6:13, at 365, 2011 Supp, at 68 [3d ed] [footnotes omitted]).

Here, viewing the evidence in the light most favorable to the prosecution, there is nothing from which a jury could reasonably infer that the defendant possessed the mens rea necessary for depraved indifference: a tragic combination of both awareness and total disregard for the fact that he was driving at high speed the wrong way down the parkway, which was conduct that placed both the defendant and others traveling eastbound on the parkway at grave risk of death. In effect, to convict the defendant of depraved indifference murder, the jury would have to find that the defendant was suicidal. There is no basis for such a finding. Rather, the evidence indicates that the defendant was highly intoxicated and upset with his girlfriend and/or with having lost something in the parking lot near the nightclub.

Moreover, even accepting the majority's contention that the defendant's intoxication did not render him incapable of forming the requisite mens rea of depraved indifference, there is

nevertheless legally insufficient evidence that the defendant actually possessed such mens rea (*cf. People v Gomez*, 65 NY2d 9 [1985]). Without minimizing the defendant's conduct or the tragic results, I contend that glaringly absent from the evidence adduced at trial is evidence, for example, that the defendant intentionally drove in the wrong direction on the parkway at a high rate of speed or continued on his path once he realized he was driving in the wrong direction on the parkway, conduct which could demonstrate "an utter disregard for the value of human life" (*People v Suarez*, 6 NY3d at 214). Instead, the evidence demonstrated that the defendant, by reason of his severe intoxication, acted recklessly by failing to perceive that he was driving the wrong way on the parkway (*see People v Valencia*, 14 NY3d at 927-928; *People v Elysee*, 12 NY3d at 105).

"Reckless homicide cannot be elevated into depraved indifference murder merely because the actions of the defendant created a risk of death, however grave or substantial that risk may have been . . . '[C]ircumstances evincing a depraved indifference to human life' are not established by recklessness coupled only with actions that carry even an inevitable risk of death" (*People v Suarez*, 6 NY3d at 213-214, quoting Penal Law § 125.25 [2]). Put differently, in general, a defendant who possesses the mens rea of depraved indifference intends to commit the act that results in the death or injury of another person, but is depravedly indifferent to the grave risk of death or injury to others as a consequence of his or her conduct, i.e., intentionally "opening the lion's cage at the zoo; placing a time bomb in a public place; poisoning a well from which people are accustomed to draw water; opening a drawbridge as a train is about to pass over it and dropping stones from an overpass onto a busy highway" (*People v Suarez*, 6 NY3d at 214). In short, "[f]ocus on the three statutory factors that distinguish depraved indifference murder—circumstances evincing a depraved indifference to human life, recklessness and a grave risk of death to another person—should . . . make clear that the statute properly applies only to the unusual case" (*id.* at 216 [internal quotation marks omitted]).

In sum, there is no valid line of reasoning that could support the jury's conclusion that the defendant possessed the mental culpability required for depraved indifference murder.

Any reliance by my colleagues in the majority on *People v Wells* (53 AD3d 181 [2008]) would be misplaced. In *Wells*, the defendant, with a blood alcohol content of between 0.25% and 0.27%, drove erratically and at an excessive speed through the streets of the lower east side of Manhattan before 3:00 A.M. on

June 14, 2004, ignoring numerous admonitions by other drivers to slow down. The defendant eventually struck another vehicle, killing its passenger and seriously injuring its driver, and was convicted after a nonjury trial of, inter alia, depraved indifference murder and depraved indifference assault. The First Department affirmed, relying on the now overruled depraved indifference standard of *People v Register* (60 NY2d 270 [1983]; *see People v Wells*, 53 AD3d at 189-190). Since this case did not apply the *Register* standard, the holding of *Wells* is not applicable here. Further, the Court of Appeals' holding in *People v Valencia* (14 NY3d 927 [2010]) discussed, *supra,* which is factually indistinguishable from *Wells,* indicates that *Wells* should no longer be followed.

I am similarly unpersuaded by the dicta in *Wells* that the depraved indifference murder conviction would be upheld under the current depraved indifference standard of *People v Feingold* (7 NY3d 288 [2006]; *see People v Wells*, 53 AD3d at 192), which is the standard applicable here. In finding that if applied, the *Feingold* standard would also be met, the *Wells* Court stated that the "defendant's mental state at the time of the collision . . . [was] not dispositive;" rather, the defendant's "mens rea of depraved indifference . . . [was] established by circumstantial evidence demonstrating that defendant made a conscious decision to drink and then, after consuming an excessive amount of alcohol to the point of becoming 'totally wasted,' to drive on city streets at a high rate of speed through red traffic lights, thereby creating a grave risk of death to pedestrians and occupants of other vehicles" (*id.* at 193). We have previously rejected the temporal remoteness between the actus reus of drinking alcohol to the point of inebriation and the mens rea at the point of collision (*see People v Valencia*, 58 AD3d 879 [2009], *affd* 14 NY3d 927 [2010]).

In addition to finding the evidence of second degree (depraved indifference) murder legally insufficient, I also find that the conviction on that count is against the weight of the evidence. Although we have a responsibility to conduct an independent review of the weight of the evidence (*see* CPL 470.15 [5]; *People v Danielson*, 9 NY3d 342 [2007]), we nevertheless accord great deference to the jury's opportunity to view the witnesses, hear the testimony, and observe demeanor (*see People v Mateo*, 2 NY3d 383, 410 [2004], *cert denied* 542 US 946 [2004]; *People v Bleakley*, 69 NY2d 490, 495 [1987]).

The People's medical expert, Dr. William Closson, testified that a blood alcohol content of 0.19% would negatively affect an "individual's cognitive abilities, meaning the thought process,

the ability to think clearly and respond to questions . . . The person's psychomotor functions, such as moving muscles and responding to various stimuli, would be negatively affected. The ability to perceive objects in the environment would be negatively affected. And then the ability to respond to those objects would be negatively affected." He further explained that the effects of alcohol "get . . . more pronounced . . . the higher the blood alcohol concentration becomes."

He specified that an intoxicated person's vision becomes blurred and he or she develops "tunnel vision," meaning he or she "cannot see as effectively to either side," but essentially sees only "straight ahead." Moreover, Dr. Closson explained that an intoxicated person's perception and responses to stimuli are delayed. Specifically, while a sober individual's response to stimuli would be "a fraction of a second," an intoxicated individual responding to the same stimuli would react in one to three seconds.

Dr. Closson also testified that an intoxicated person's ability to do "divided attention tasks," such as driving, is "most affected" by alcohol. Thus, while driving requires equal attention to steering, acceleration, braking, direction signals, and responding to objects in the environment, an intoxicated person may devote all of his or her attention to only one or two of those tasks. Although he testified on direct examination that an intoxicated person may be more inclined to participate in risky behavior, such as driving the wrong way on a roadway, on cross-examination, he conceded that an intoxicated person may be unaware that he or she is driving the wrong way on a roadway.

Although the defendant's friend testified that in his view, the defendant was not too intoxicated when they exited the nightclub together, the defense conceded at trial the accuracy of the blood test results, which showed the defendant's blood alcohol content to be 0.19% over one hour after the incident. Further, an officer who arrived at the scene moments after the crash described the inside of the defendant's car as having an "extremely strong odor" of alcohol. After the defendant was removed from his vehicle and placed under arrest for driving while intoxicated, the officer described the smell of alcohol coming directly from the defendant.

Significantly, the People presented no evidence that the defendant intentionally entered the parkway in the wrong direction and/or continued to drive the wrong way after realizing that he was driving against traffic. Indeed, one witness, an off-duty sergeant for the New York City Police Department, testified that he swerved out of his lane to avoid being hit by the de-

fendant's vehicle, and described the defendant's vehicle as staying in the lane closest to the barrier and not reacting to the sergeant's car as it swerved out of the path of the defendant's vehicle. Such eyewitness testimony is consistent with that of the People's expert, Dr. Closson, who explained that intoxicated persons experience tunnel vision and lack the ability to concentrate on the numerous tasks required to drive.

Although the People presented the testimony of numerous witnesses who saw the defendant's vehicle traveling in the wrong direction on the parkway, none of those witnesses's testimony established that the defendant understood that he was traveling in the wrong direction. While some witnesses attempted to warn the defendant of his mistake by honking their horns, there is no evidence that the defendant heard those warnings or understood that the warnings were intended for him. Nor did the People's collision reconstruction expert provide any testimony indicating that the defendant may have intentionally driven the wrong way down the parkway. In sum, no credible evidence demonstrated that the defendant deliberately drove his vehicle the wrong way with an utter disregard for the value of human life, and thus acted with depraved indifference. Accordingly, I agree with Justice Cohen's statement in his dissent in *People v Heidgen*:

"I cannot agree with the majority's attempts to distinguish the Court of Appeals' decisions in *People v Prindle* (16 NY3d 768 [2011]), and *People v Valencia* (14 NY3d 927 [2010]), from the facts before us. To distinguish *People v Prindle* would necessitate a finding that the evasion of police vehicles in the course of a high-speed chase while sober is a less culpable state of mind than driving on the wrong side of a highway at 70 miles per hour, at night, in a highly intoxicated state. Likewise, distinguishing *People v Valencia* necessitates finding, in the evidence presented to the jury, that the defendant was neither totally oblivious nor incapable of apprehending the gravity of his actions due to his intoxication. I do not subscribe to such conclusions" (*People v Heidgen*, 87 AD3d at 1034 [Cohen, J., dissenting]).

In sum, the weight of the evidence does not support a finding that the defendant, acting with depraved indifference, i.e., "an utter disregard for the value of human life" (*People v Suarez*, 6 NY3d at 214), knowingly drove the wrong way down the parkway. The defendant may have been the instrument of death. However, there is no evidence that he knowingly acted with utter disregard for the grave risk of death or serious injury he was creating. Rather, the evidence established that the defendant

acted recklessly in driving his vehicle while severely intoxicated (*see* Penal Law § 15.05 [3]), which led to the tragic death of an innocent person (*see* Penal Law § 125.15 [3]). "The *Feingold* standard is a stringent one. There is no such thing as constructive depravity. The analysis is wholly subjective. The mental state is actual" (Ryan J. Mahoney, Note, *Depraved Indifference Murder in the Context of DWI Homicides in New York*, 82 St. John's L Rev 1537, 1576 [2008]). In short, the People's evidence established that the defendant acted recklessly, but not that he acted with depraved indifference.

For the reasons set forth above, I would modify the judgment by reducing the defendant's conviction of second degree murder to manslaughter in the second degree (*see* Penal Law § 125.15 [1]), a lesser-included offense of murder in the second degree upon which the jury was instructed, vacate the sentence imposed on that count, and remit the matter to the County Court, Nassau County, for resentencing on that count.